**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF CALIFORNIA; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF HAWAI'I; THE STATE OF ILLINOIS; THE OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; JOSH SHAPIRO, in his official capacity as Governor of the COMMONWEALTH OF PENNSYLVANIA; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WISCONSIN, | Court No. 26-03467 |
| | |
| Plaintiffs, | THREE-JUDGE COURT REQUESTED |
| | |
| v. | |
| | |
| DONALD J. TRUMP, in his official capacity as the President of the United States; THE UNITED STATES; JAMIESON GREER, in his official capacity as United States Trade Representative; THE OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; RODNEY S. SCOTT, in his official capacity as the Commissioner for U.S. Customs and Border Protection; U.S. CUSTOMS AND BORDER PROTECTION, | |
| | |
| Defendants. | |

## **COMPLAINT**

1. For more than a year and a half, the President has unilaterally imposed tariffs without legal authority to do so. These tariffs have been sweeping and broad, encompassing virtually all imported products from scores of countries. Since April 2, 2025, the President has

1

attempted to impose tariffs of at least 10% on most products worldwide. This Court has twice invalidated those efforts, holding that neither the International Emergency Economic Powers Act (IEEPA) nor Section 122 of the Trade Act of 1974 was a legal basis for the President's trade policy. The Administration's third attempt to impose worldwide tariffs—now through Section 301 of the Trade Act—is equally unlawful.

2.      The President first relied on IEEPA, a 1977 statute that had, unsurprisingly, never been used to attempt any sort of tariff policy. The Supreme Court has since ruled that IEEPA does not authorize the imposition of tariffs at all.

3.      The same day the U.S. Supreme Court declared the President's IEEPA tariffs illegal, the President announced across-the-board tariffs of 10% on nearly all imports, invoking another statute that had never been used for such a purpose: Section 122 of the Trade Act. 19 U.S.C. § 2132. Plaintiffs, including State Plaintiffs here, challenged those tariffs, and this Court determined those tariffs to be illegal as well. *See Oregon v. Trump*, __ F. Supp. 3d __, No. 26-01472-3JP, 2026 WL 1257669 (Ct. Int'l Trade May 7, 2026), *stay granted*, No. 2026-1804, 2026 WL 1702442 (Fed. Cir. June 11, 2026).

4.      Now, the Office of the United States Trade Representative (USTR), under the guise of combatting forced labor in global trade, is determined to again implement sweeping tariffs that the President called for, this time through yet another mechanism used in a novel way: Title III of the Trade Act of 1974, often referred to as "Section 301." 19 U.S.C. §§ 2411–2420.

5.      On July 23, 2026, the USTR published a Notice of Action imposing 10% or 12.5% tariffs on nearly all goods from virtually every country with whom the United States trades. *Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy To Impose and Effectively Enforce a*

*Prohibition on the Importation of Goods Produced with Forced Labor*, 91 Fed. Reg. 47,318

(July 28, 2026) (the Tariff Action).

6. The Tariff Action is arbitrary, capricious, and contrary to law. The Plaintiff States oppose forced labor in all its forms and support protections for workers around the globe. But the Administration cannot use forced labor as a pretext to continue its illegal tariff scheme. The tariffs the USTR imposed are so broad that they defy the USTR's own stated aims and make a mockery of the statute used to justify them.

7. In the Tariff Action, the USTR grouped 60 purportedly investigated economies into only four tariff categories—10% on 17 economies, 10% net-of-MFN on two economies (including the entire European Union, which encompasses 27 member states), 12.5% net-of-MFN on three economies, and 12.5% on 38 economies. The narrow 2.5% spread between the two nominal rates and the coarse clumping of economies into four groups strongly suggest no real relationship between the purportedly unreasonable practices of every substantial United States trading partner and the tariff rates the USTR is imposing on them.

8. The USTR identified no link between tariff rates and the prevalence of forced-labor-tainted goods by economy, did not engage or respond meaningfully to the comments and testimony that undercut USTR's claimed rationale, established product-based exemptions inconsistent with the USTR's own exemplars, and did not weigh the costs and benefits of the Tariff Action. In short, there is no rational fit between the purported problem of forced labor in international supply chains and the blanket global tariffs the USTR imposed.

9. Section 301 authorizes the USTR only to take "appropriate and feasible action . . . to obtain the elimination of" the trading partner's "unreasonable or discriminatory" "act, policy, or practice"—here, the USTR's claims of underenforcement of restrictions on the importing of

3

products made with forced labor. 19 U.S.C. § 2411(b). Yet the USTR's Tariff Action operates as an implementation of the President's broad tariff policy rather than the kind of tailored measure authorized under Section 301. The USTR identifies no mechanism by which an economy could be released from the tariffs through strengthened forced-labor-import enforcement, sets no benchmarks to measure the effectiveness of a country's import controls, and erects an effective floor of 10% even on countries that the USTR acknowledges are making efforts to combat forced-labor-imports, signaling that no level of remedial action would suffice to lift the tariffs under this Administration. Because the Tariff Action is not targeted "to obtain the elimination" of forced labor imports in foreign supply chains, it cannot be imposed under Section 301.

10.     These defects are buttressed by strong evidence of pretext: after this Court twice invalidated the Administration's worldwide tariffs under other statutes, the President and Ambassador Jamieson Greer, the U.S. Trade Representative, announced an accelerated plan to "ensure continuity" by using Section 301 to impose "exactly" the same tariffs. The USTR timed and structured its investigation and the Tariff Action to replace the expiring Section 122 tariffs without interruption. The confluence of these three factors—the contemporaneous admissions describing how the Administration predetermined an endpoint under Section 301 for worldwide tariffs unrelated to Section 301's purpose, the completion of the purported investigation of 60 different economies in record time, and the end result after this accelerated investigation of Section 301 tariffs that just so happen to mirror almost exactly the now-expired Section 122 tariffs—confirms that the Tariff Action is pretextual, arbitrary, capricious, and contrary to Section 301's statutorily constrained purpose.

4

**PARTIES**

I.    **Plaintiff States**

11.    The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

12.    The State of Arizona is a sovereign state of the United States. Arizona is represented by Attorney General Kristin K. Mayes. The Attorney General is Arizona's chief law enforcement officer and is authorized to institute this action.

13.    The State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California, who is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of the State. Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12510–12511.

14.    The State of Colorado is a sovereign state of the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colorado Revised Statute § 24 31-101 to pursue this action.

15.    The State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

16.    The State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the

"chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

17.     The State of Hawaiʻi, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statutes § 28-1 to pursue this action.

18.     The State of Illinois, acting by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America. As the state's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter. Ill. Const. art. V, § 15; 15 Ill. Comp. Stat. 205/4.

19.     Plaintiff Office of the Governor, *ex rel*. Andy Beshear, brings this suit his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky. Const. § 81. In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution. Ky. Const. § 228. Under Kentucky statute, the Governor is the head of his General Cabinet and his Executive Cabinet. Ky. Rev. Stat. § 11.060; Ky. Rev. Stat. § 11.065.

20.     The State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

21.     The State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

22.     The Commonwealth of Massachusetts is a sovereign State of the United States.  Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief law enforcement officer.

23.     The State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

24.     The State of Minnesota is a sovereign state of the United States of America. Minnesota's Attorney General, Keith Ellison, is the chief law enforcement officer of Minnesota and is authorized under Minnesota Statutes Chapter 8 and has common law authority to bring this action on behalf of the State and its residents, to vindicate the State's sovereign and quasi-sovereign interests, and to remediate all harm arising out of—and provide full relief for—violations of the law.

25.     The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

26.     The State of New Jersey is a sovereign state of the United States of America. New Jersey is represented by and through its chief legal officer, Attorney General Jennifer Davenport, who has authority to represent the State in this matter.

27. The State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico and is authorized to pursue this action under N.M. Stat. § 8-5-2(B).

28. The State of New York is a sovereign state in the United States. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

29. The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

30. Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6).

31. The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

32. The State of Vermont is a sovereign state of the United States. Vermont is represented by its Attorney General, Charity Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

33. The Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent

8

the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

34.     The State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown, who is the chief legal advisor to the State and is authorized to act in federal court on behalf of Washington on matters of public concern.

35.     The State of Wisconsin is a sovereign state in the United States. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to pursue this action.

## II.     Federal Defendants

36.     Donald J. Trump is the President of the United States and is sued in his official capacity.

37.     The United States is a statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581. Those statutes also waive the United States' sovereign immunity. *See Humane Soc'y of U.S. v. Clinton*, 236 F.3d 1320, 1328 (Fed. Cir. 2001).

38.     Jamieson Greer is the United States Trade Representative. He is sued in his official capacity.

39.     The Office of the United States Trade Representative is an agency of the federal government and a component of the Executive Office of the President of the United States. Under Section 301, the USTR is charged with conducting any investigation of a foreign country's trade practices and implementing an appropriate response, subject to the direction of the President. USTR conducted the Section 301 investigation at issue and is the agency that acted to impose the tariffs here.

40.     Rodney S. Scott is the Commissioner for U.S. Customs and Border Protection (CBP). In this capacity, he oversees CBP's collection of duties paid by Plaintiffs and third-party importers pursuant to the tariffs at issue here. He is sued in his official capacity.

41.     U.S. Customs and Border Protection is the agency that collects duties on imports. CBP collected payments made by Plaintiffs to account for the tariffs imposed by USTR.

## JURISDICTION

42.     This Court has subject-matter jurisdiction under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1).

43.     Plaintiff States request that the Chief Judge of this Court designate three judges "to hear and determine" this action because it "has broad or significant implications in the administration or interpretation of the customs laws." 28 U.S.C. § 255(a)(2).

## FACTUAL AND LEGAL BACKGROUND

**I.     USTR Purported to Conduct a Rushed, Cursory Section 301 Investigation of 60 Economies Covering Virtually All U.S. Imports.**

44.     On March 12, 2026, the USTR announced it was initiating a Section 301 investigation into 59 countries and the EU regarding forced labor practices. Press Release, USTR, USTR Initiates 60 Section 301 Investigations Relating to Failures to Take Action on Forced Labor (Mar. 12, 2026), https://ustr.gov/about/policy-offices/press-office/press-releases/2026/march/ustr-initiates-60-section-301-investigations-relating-failures-take-action-forced-labor [https://perma.cc/V5HE-KXKT].

45.     On June 2, 2026—just two and a half months after announcing the investigation—the USTR published its findings in a single document entitled, *Report in Section 301 Investigations: Acts, Policies, and Practices of the Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced*

10

*with Forced Labor* (2026) (the Report). The USTR then published its actionability determination and proposal to impose global tariffs in the Federal Register. *Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 91 Fed. Reg. 34,272 (June 5, 2026) (the Proposal).

46.     Typically, a Section 301 investigation into even a single economy takes much longer to complete. For example, the USTR's investigation of China's technology transfer and intellectual property policies was initiated on August 24, 2017, and spanned more than eight months, culminating in an April 2018 proposal to impose tariffs. The USTR issued the final Notice of Action on June 20, 2018. *Investigation: Technology Transfer, Intellectual Property, and Innovation*, USTR, https://ustr.gov/issue-areas/enforcement/section-301-investigations/ section-301-china/investigation [https://perma.cc/EX4F-9TCL] (last visited Aug. 3, 2026).

47.     The USTR's Section 301 investigation of Brazil for its digital trade, tariff, and anti-corruption enforcement policies took exactly one year. The investigation was initiated on July 15, 2025; the tariff proposal was put forth on June 1, 2026; and the final Notice of Action was issued on July 15, 2026. *Section 301 – Brazil's Acts, Policies, and Practices Related to Digital Trade and Electronic Payment Services; Unfair, Preferential Tariffs; Anti-Corruption Enforcement; Intellectual Property Protection; Ethanol Market Access; and Illegal Deforestation*, USTR, https://ustr.gov/trade-topics/enforcement/section-301-investigations/ section-301-brazils-acts-policies-and-practices-related-digital-trade-and-electronic-payment [https://perma.cc/3SYC-THMG] (last visited Aug. 3, 2026).

48.    Both the Report and the Proposal relied on a cursory survey of whether each of 59 separate countries and the EU have laws that prohibit the importation of goods made with forced labor and, for each country that does have such laws, conclusory statements that those countries do not adequately enforce these import laws.[1]

49.    On July 23, the day before the Section 122 tariffs were set to expire on their own terms, the USTR published a Notice of Action on its website and published it in the Federal Register on July 28. *Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 91 Fed. Reg. 47,318 (July 28, 2026) (the Tariff Action). The tariffs became effective at 12:01 a.m. the next day. *Id*.

50.    The Tariff Action relied on the Report and Proposal, with some additional references to negotiations that took place after the Report was published, to implement 10% and 12.5% tariffs on most imports from the 60 economies that the USTR investigated. The tariffs cover countries that together account for 99.4% of imports to the United States. Report at 1.

51.    The Tariff Action itself acknowledged bilateral and multilateral treaties that recognize the need to prevent trade in forced labor goods, including the United States–Mexico–Canada Agreement (USMCA). The Report highlighted only three examples of goods known to be produced in part with forced labor—tobacco from Malawi, rice from Burma, and beef from Brazil—in an attempt to illustrate that forced labor goods have an effect on global commerce. Report at 38.

---

[1] The Report and Proposal do not claim that these countries are themselves employing forced labor or failing to enforce restrictions on the use of forced labor. Rather, the Report and Proposal claim that these countries are not sufficiently implementing or enforcing bans on importing goods from *other* countries that might have employed forced labor.

52.    The Proposal then pointed to those three examples to justify levying 10% and 12.5% tariffs on nearly all imports from nearly all economies that were investigated. Fourteen economies (13 countries and the EU) that either already impose a forced labor prohibition or have made commitments such as part of their Agreements on Reciprocal Trade, are tariffed at 10%. The remaining 46 countries are tariffed at 12.5%.

53.    The Tariff Action adjusts the tariff levels for some countries from the Proposal to account for most-favored-nation (MFN) duties for some countries and to account for negotiations that took place after the Report and Proposal were published. The Tariff Action levies 10% tariffs on 17 countries; 10% net-of-MFN tariffs on 2 economies (including the EU, which has 27 member states); 12.5% net-of-MFN tariffs on 3 countries; and 12.5% tariffs on 38 countries. 91 Fed. Reg. 47,321–28.

54.    The Tariff Action and the Report and Proposal leading to the Tariff Action do not satisfy the requirements of Section 301 because the USTR did not undertake the required level of investigation and consultation and did not identify appropriate agency action tailored to eliminate the purportedly unreasonable conduct of concern.

55.    The Tariff Action constitutes a final agency action under the Administrative Procedure Act. The Tariff Action marks the consummation of the USTR's decision-making process and legal consequences flow from it, i.e., the tariffs at the rates set out in the Tariff Action. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

## II.    The Section 301 Investigation Is a Pretextual and Unlawful Effort to Exert Unfettered Tariff Power.

56.    Section 301 authorizes USTR only to take "appropriate and feasible action . . . to obtain the elimination of" the trading partner's "unreasonable or discriminatory" "act, policy, or practice." 19 U.S.C. § 2411(b). A purported categorical investigation with no individualized

treatment of different economies is contrary to the statute's directives and thus must be, by definition, neither appropriate nor feasible. Because the Tariff Action merely attempts to continue the President's blanket global tariff policy, and the attempt "to obtain the elimination" of forced labor in trading partners' supply chains is pretextual, it is unlawful.

57.    When the Supreme Court struck down the President's IEEPA tariffs as unlawful on February 20, 2026, Ambassador Greer immediately responded by publishing a press release stating that "alternative tools would be implemented to address many of the issues at the heart of the President's reciprocal tariff program." Press Release, USTR, Ambassador Greer Issues Statement on Supreme Court IEEPA Decision (Feb. 20, 2026), https://ustr.gov/about/policy-offices/press-office/press-releases/2026/february/ambassador-greer-issues-statement-supreme-court-ieepa-decision [https://perma.cc/C7VB-26X3]. Ambassador Greer stated that the Trump Administration would "**[i]mmediately impose a temporary 10 percent surcharge on articles imported into the United States, pursuant to Section 122 of the Trade Act of 1974**." Ambassador Greer further stated that the Administration would "**[i]nitiate several investigations under Section 301 of the Trade Act of 1974 ('Section 301')**" and "conduct these investigations on an accelerated timeframe," following which "tariffs are one tool that may be imposed." *Id.* (emphasis in original).

58.    Ambassador Greer's announcement did not make any mention of forced labor. Rather, the USTR stated these planned steps under Section 122 and Section 301 would be taken "to ensure continuity" with the Administration's original (unlawful) tariffs under IEEPA. *Id.*

59.    Likewise, that same day, in response to the Supreme Court striking down the unlawful IEEPA tariffs, the Treasury Secretary Scott Bessent publicly stated how "[t]his Administration will invoke alternative legal authorities to replace the IEEPA tariffs" and how

"Treasury's estimates show that the use of Section 122 authority, combined with potentially enhanced Section 232 and Section 301 tariffs will result in virtually unchanged tariff revenue in 2026." Scott Bessent, Sec'y, U.S. Dep't of Treasury, Remarks Before the Economic Club of Dallas: Economic Security First (Feb. 20, 2026), https://home.treasury.gov/news/press-releases/sb0403 [https://perma.cc/9NKD-22YR].

60.     Section 122 does not allow the President to impose tariffs beyond 150 days. 19 U.S.C. § 2132(a). The Administration thus knew that its attempt to use Section 122 to reimpose its unlawful IEEPA tariffs would expire by July 2026, and that it would need to dig up another statutory vehicle to reimpose its blanket worldwide tariffs policy thereafter.

61.     President Trump and Ambassador Greer discussed this plan in public remarks on March 3, 2026. As the President explained, after the Supreme Court struck down his unlawful IEEPA tariffs, "what we've done is we've gone to a very simple straight 15 percent tariff [under Section 122[2]]. It's taken in — we've taken in hundreds of billions of dollars in our country because of tariffs. So, we've taken in all of this money — hundreds of billions of dollars, and honestly, it's made us very rich as a country. So, it's been doing good. When will you have the full plan implemented? We have a five-month period — up to five months, where we can go at 15 percent [under Section 122]. And while we're doing that, as you know, we're doing the various studies and things and we'll be coming out with tariffs, different tariffs on different countries. You want to talk about that?" Ambassador Greer responded, "Yes, sir. By the time the five-month period has elapsed, we'll have completed investigations under Section 301 that Secretary Bessent talked about."

---

[2] After imposing 10% tariffs under Section 122, President Trump announced that he would raise the Section 122 tariffs to 15% but never formally put that announced raise into effect.

62.     At this point, the USTR had not even started, much less completed, its Section 301 investigation. Yet it was already publicly stating that it would conduct its investigations on an expedited schedule to complete them by the time the Section 122 tariffs expired, so that new tariffs under Section 301 could be imposed in their place.

63.     On March 12, nine days after the President and Ambassador Greer issued their remarks, the USTR announced its Section 301 investigation into more than 80 countries, which account for 99.4% of U.S. imports. Then, just two and a half months after announcing that investigation, the USTR proposed imposing tariffs of 10% to 12.5% on every single one of these countries.

64.     Treasury Secretary Bessent publicly discussed the rationale behind these proposed Section 301 tariffs on June 24: "The president [first] used IEEPA, which was a very efficient way to put on tariffs. We have rebooted the tariff program. Right now, we have something called section 122 tariffs, which is a 10 percent global tariff. Currently, USTR, Ambassador Jamieson Greer, is doing studies for section 301. And if those studies are successful and I have no reason to believe they won't be, but we don't know until they are, *then the tariff rates are going to go back to exactly where they were*" (emphasis added). In other words, Section 301 was simply another, premeditated vehicle for the Administration to reimpose tariff rates "back to exactly where they were" under the original (unlawful) IEEPA tariffs and the (also unlawful) Section 122 tariffs.

65.     Two days before the Section 122 tariffs expired, Ambassador Greer testified before Congress and reaffirmed that the Administration remained intent on imposing tariffs, regardless of the legal vehicle. He stated that: "The specific authorities this administration is

16

using have changed, but the trade strategy has not. Specifically, we are continuing to impose tariffs . . . .”

66.     The unlawful Section 122 tariffs expired on their own terms on July 24, 2026.

67.     The day before they expired, USTR published the Tariff Action putting Section 301 tariffs into effect immediately, continuing without interruption the tariff scheme the Administration has twice attempted to implement under IEEPA and Section 122.

68.     In fact, Annex A of the Proposal, which lists goods exempted from the proposed Section 301 tariffs, was identical to Annexes I and II of the Section 122 Proclamation. *Compare* Proclamation No. 11012, Annexes I & II (Feb. 20, 2026), *with* 91 Fed. Reg. 34,277–344.

69.     Ultimately, Annexes I and II of the Tariff Action exempt the same goods as those exempted from the Section 122 tariffs. Annex II the Tariff Action incorporates an additional 466 goods from all countries, 91 Fed. Reg. 47,396–490, and supplemental exemptions for certain countries, based on negotiations with those countries, *id.* at 47,491–662.

70.     The Tariff Action admitted that the products tariffed are not limited to—or even related to—products linked to forced labor. *See* 91 Fed. Reg. 47,334.

71.     Even the tariff rates levied under Section 301—10% on the 19 economies that have laws or agreements prohibiting the importation of forced labor goods and 12.5% on the remaining 41 economies (with 5 economies tariffed at that level net of MFN rates)—are similar to the prior tariff rates imposed under Section 122. *Compare* Proclamation No. 11012, ¶ 13 (imposing 10% ad valorem surcharge), *with* 91 Fed. Reg. 47,321–28 (listing countries subject to 10% or 12.5% tariffs based on findings purportedly related to forced labor).

72.     There is no link between the tariffs imposed and estimates of the percentage or volume of goods tainted by forced labor in each country, and the Tariff Action claims none.

73.     The Report cited a U.S. Department of Labor publication enumerating goods produced with forced labor, but neither the Report nor the Tariff Action explained why certain products listed in that publication are exempted from the tariffs in Annexes I and II of the Tariff Action. In fact, one of just three examples the Report relied upon—of goods purportedly made with forced labor—is frozen beef from Brazil. But Annex I exempts many beef products from the tariffs, including frozen beef from Brazil.

74.     Furthermore, with few exceptions, Annexes I and II of the Tariff Action list exemptions by product, not country, further belying the notion that the tariffs are designed to change certain countries' importation of certain goods that use forced labor. The U.S. Department of Labor publication cited in the Report listed other products, such as coffee, copper ore, cobalt ore, and mined elements that are produced with forced labor—all of which are similarly exempted from tariffs. The Report and Tariff Action do not explain why importing these products without tariffs, while imposing tariffs on countless other products that bear no risk of being produced with forced labor, is an appropriate action under Section 301.

75.     The speed of the investigation similarly is evidence of its pretextual nature. The USTR announced right from the outset, on the very day that the Administration's unlawful IEEPA tariffs were struck down, that it "intended to conduct [Section 301] investigations on an accelerated timeframe" in order to "ensure continuity" with the IEEPA and Section 122 tariff regime. The USTR purported to conduct an investigation into 60 different economies and published a single Report and Proposal in less than three months, followed by the Tariff Action shortly thereafter—one day before the Section 122 tariffs were set to expire—an obvious effort to implement Section 301 tariffs immediately after the Section 122 tariffs expired.

18

76. Such haste undermines a key purpose of Section 301, which is to allow negotiations with trading partners and incentivize them to change their behavior. *See* 19 U.S.C. § 2413 (requiring the USTR to request consultations with the foreign country concerned regarding the issues involved in an investigation).

77. The USTR made no effort to link the scope of the tariffs to the scope of harm, or to justify why the tariff rates of 10% and 12.5% are "appropriate," as Section 301 requires. Neither the Report nor the Tariff Action claim the tariffs will lead to less need for inspection of goods or result in any meaningful change in countries' behavior. The Report and Tariff Action do not specify benchmarks or goals for enforcing forced-labor import laws that countries can meet to graduate out of the tariffs. The USTR's failure to link the tariffs to the scope of harm further supports that the purported reasoning for the tariffs is pretextual.

78. In addition, the Administration has repeatedly made public announcements that it expects global tariffs at the same or similar levels to continue, because they are a priority of President Trump. The USTR is therefore attempting to continue the President's preferred policy by shoehorning tariffs previously ruled unlawful under IEEPA and Section 122 into a Section 301 report—regardless of any actual connection to forced labor imports. Section 301 does not contemplate handing the President such broad authority.

## III. Defendants Failed to Comply with Section 301's Strict Limits.

79. "The power to impose tariffs is very clearly a branch of the taxing power." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 240 (2026) (citation modified). The Framers of the U.S. Constitution "did not vest any part of the taxing power in the Executive Branch"; rather, "[t]he whole power of taxation rests with Congress." *Id.* at 241.

19

80.    "When Congress has delegated its tariff powers, it has done so in explicit terms, and subject to strict limits." *Id.* at 243 (Roberts, C.J., plurality op.). It has capped the amount and duration of tariffs and "conditioned exercise of the tariff power on *demanding procedural prerequisites*." *Id.* at 243–44 (citing investigations under Section 301) (emphasis added). At no point has Congress given "the President power to unilaterally impose unbounded tariffs," which would "represent a 'transformative expansion' of the President's authority over tariff policy, and indeed . . . over the broader economy as well." *Id.*

81.    To that end, Section 301 imposes a number of specific limits and significant procedural and substantive requirements. The USTR has violated those limits and ignored those requirements in the Administration's latest attempt to wrest tariff power from Congress and unilaterally impose the President's preferred tariff policy.

82.    The USTR may take action under Section 301(b) only after making a determination under Section 304(a)(1) that an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce. 19 U.S.C. §§ 2411(b), 2414(a)(1).

83.    Section 304(a)(1), in turn, provides that the USTR can make such a determination only on the basis of an investigation initiated under Section 302 and "consultations with the foreign country concerned regarding the issues involved in such investigation" under Section 303. 19 U.S.C. §§ 2412, 2413(a)(1), 2414(a)(1).

84.    These statutorily required "consultations" require at least "*some* effort by [the agency] to receive [the affected party's] views . . . and then [to] consider such advice." *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 120 (1st Cir. 2002). Significantly, "[c]onsultation is a process that requires reciprocal communication of some substance; it is not

20

satisfied by a rubber stamp or a sign-off on a decision that has already been made." *Doe v. Noem*, __ F. Supp. 3d __, No. 26 Civ. 2103 (DEH), 2026 WL 1192079, at \*12–13 & n.13 (S.D.N.Y. May 1, 2026) (collecting cases), *appeal docketed*, No. 26-1748 (2d Cir. June 29, 2026).

85.    If, following the required investigation and consultations, the USTR determines that an act, policy, or practice of the foreign country at issue "is unreasonable or discriminatory and burdens or restricts United States commerce," and that "action by the United States is appropriate," Section 301 allows the USTR to take all "appropriate and feasible action . . . to obtain the elimination of that act, policy, or practice." 19 U.S.C. § 2241(b)(1), (2).

86.    To be "appropriate" under Section 301, an action must be "one that can end or reverse the investigated conduct." *See HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1252–53 (Fed. Cir. 2025), *cert. denied*, 2026 WL 1718004 (June 15, 2026). Consequently, any tariffs imposed under Section 301 "must be tailored to achieve Section 301's statutory goal of eliminating the investigated conduct." *Id.* at 1253. Nothing in Section 301 allows the USTR "to raise tariffs for any reason or by an amount that exceeds" what is appropriate to achieve eliminating the investigated conduct. *Id.* Section 301 limits the tariffs that may be imposed to those appropriate to eliminate the specific foreign practices found to be unfair "after a full investigation." *Id.*

87.    Section 301 also does not allow the Executive to impose tariffs against foreign countries en masse. Rather, Section 301 sets out procedure by which the USTR conducts a focused investigation regarding specific acts, policies, or practices by a specific foreign country. As Congress stated in enacting Section 301, "actions taken by the [Executive] under Section 301 should generally be on a *selective* basis, that is, only against those countries found to discriminate against U.S. commerce." S. REP. NO. 93-1298, at 31 (1974) (emphasis added).

21

Furthermore, in addressing forced or compulsory labor specifically, Section 301 contemplates that the USTR will consider whether the foreign country has taken or is taking actions that demonstrate "overall advancement" in addressing the conduct at issue and to account for the "level of economic development of the foreign country." *See* 19 U.S.C. § 2411(d)(3)(C)(i).

88.    The Tariff Action plainly does not comply with these strict procedural constraints.

89.    Here, the USTR used a single blanket notice to open 60 "investigations" of 60 distinct economies that together account for 99.40% of all U.S. imports. *See* 91 Fed. Reg. 12,884 (Mar. 17, 2026).

90.    After an abbreviated, two-and-a-half-month long "investigation" purportedly into forced-labor import practices in all 60 economies, the USTR produced the Report and Proposal purportedly justifying reimposition of blanket global tariffs—tariffs the Administration had previously tried and failed to impose under IEEPA and Section 122.

91.    Less than two months after its Report and Proposal, and after receiving over 1,600 additional written comments and additional testimony from over 100 witnesses, the USTR published its Tariff Action imposing the proposed tariffs with a handful of modest changes.

92.    The Tariff Action contained no finding explaining why tariffs at the rate of 10% or 12.5% are what is "appropriate" to eliminate the claimed forced-labor import practices at all, much less why either of these tariff rates is the level "appropriate" to respond to the purported problem in each of the 60 different economies at issue.

93.    As the USTR expressly acknowledged in the Tariff Action, its sweeping tariffs include countries that have *already entered into* Agreements on Reciprocal Trade with the United States regarding forced-labor import prohibitions, i.e., the very conduct that the USTR purports to seek to eliminate. The USTR asserted that such commitments become operative only

22

in the future. But the USTR provides no explanation or rationale why, for any one of these countries, an additional 10% tariff—on top of a forced-labor prohibition with an operative date that the United States itself negotiated— is "appropriate" or tailored to achieving Section 301's statutory goal.

94.    The USTR's disregard of Section 301 requirements that actions be selective, appropriate, and tailored renders the Executive "unconstrained by the significant procedural limitations in [Section 301] and free to issue a dizzying array of modifications at will." *Learning Res.*, 607 U.S. at 244 (Roberts, C.J., plurality op.). "That view, if credited, would represent a transformative expansion of the [Executive]'s authority over tariff policy, and indeed . . . over the broader economy as well." *Id.* (citation modified).

95.    "The lack of historical precedent for th[ese] tariffs, coupled with the breadth of authority that the [Executive] now claims, is a telling indication that the tariffs extend beyond the [Executive]'s 'legitimate reach.'" *Id.* at 245–46 (citation modified) (citing *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 119 (2022)); *id.* at 250 (majority op.) ("[T]he fact that no President has ever found such power [in claimed tariff statute] is strong evidence that it does not exist.").

**IV.    The Record Does Not Support Sweeping Tariffs to Combat Forced Labor.**

96.    Over the past four months, USTR sought public comments and testimony regarding its Section 301 investigation. However, the comments and testimony the USTR compiled do not support implementing tariffs as a method to combat forced labor; rather, the comments and testimony show that the USTR acted arbitrarily and capriciously.

97.    As the comments and testimony explained, the Section 301 tariffs bear no reasonable connection to the harms identified in the Tariff Action, namely, supposed failures to implement or enforce import bans of goods that might have been produced with forced labor. In

23

addition, the tariffs are incoherent in at least two ways: the USTR treats countries with and without certain mechanisms to stop forced-labor imports similarly; and within each of those two categories, the USTR treats differently situated nations identically, despite their facing different challenges in stopping imports of goods that might have been produced with forced labor and having already taken different steps. And the USTR did not adequately engage at any step of its process with the comments and testimony it received in opposition to the imposition of tariffs under Section 301.

### A.    The Section 301 Tariffs Treat Unlike Cases Alike.

98.    The record establishes that the Section 301 tariffs will be applied in a nearly uniform manner, one that fails to account for the very different legal, institutional, and enforcement positions of the United States' trading partners.

99.    Under the Tariff Action, economies with and without specific mechanisms to prevent imports of goods that might have been produced with forced labor are treated similarly. The USTR recognized that 19 of the 60 economies investigated have prohibitions or commitments on the importation of goods produced with forced labor (or, in one case, a post-investigation commitment to create such a prohibition). Yet the USTR treats those 19 economies similarly to the 41 it claims lack such a prohibition. The tariff rates differ by only 2.5% between these two distinct categories of economies. The USTR makes no effort to explain why similar solutions will work for these differently situated economies.

100.    Additionally, the tariffs treat different economies alike within each category. Within each of the USTR's tariff categories—namely, economies without forced-labor import bans and economies with bans but purportedly insufficiently effective mechanisms—the affected jurisdictions are materially different. A uniform tariff cannot be rationally justified across them and, importantly, the USTR does not explain or justify the uniform treatment.

24

101.    Several witnesses at the various public hearings explained that economies lacking formal forced-labor import ban mechanisms nonetheless vary widely in legal frameworks, import inspection capacity, economic development, industry composition, and degree of engagement with the United States. The USTR gave no explanation for why countries like Peru, that have taken many steps to protect against the import of goods that might have been produced with forced labor, are treated identically to those that have taken fewer or no steps.

102.    The USTR also treats countries with formal forced-labor import bans identically, despite important differences in the effectiveness of those bans. For example, representatives from Mexico, Ecuador, and India all testified in the USTR's first round of hearings. The representative from Mexico emphasized its fully implemented forced-labor import ban based on the USMCA and the substantial expansions Mexico adopted in 2025, including investigation protocols and sustained coordination with the United States. The representative from Ecuador detailed not only its constitutional prohibitions on forced labor but also recent judicial enforcement actions and Ecuador's ongoing development of a national mechanism to restrict forced labor imports. India's representative, by contrast, testified to more limited enforcement capacity and ongoing developmental work.

103.    Despite Mexico and Ecuador being in quite different positions than India, the USTR applied the same tariff rate to all three of these economies—and to all other economies that the USTR deemed to have insufficiently effective import-enforcement mechanisms. This disregard for meaningful differences in enforcement progress and institutional capacity renders the tariff schedule internally inconsistent and unreasonable.

104.    Despite the USTR's irrational uniformity, the Tariff Action also distinguishes between nations within each category for inexplicable reasons.

25

105.    Nearly every investigated country has most-favored-nation status. Yet USTR determined that five of the investigated countries should receive "net of MFN rate" treatment, meaning the sum of all tariffs on that country is capped at the rate imposed by the Section 301 tariffs, while the rest of the countries receive stacking tariffs, i.e., the new tariffs are added to any existing tariffs without any cap.

106.    The USTR included no reasoned explanation for these different treatments other than to baldly state it is "appropriate to encourage an economy to fulfill commitments regarding forced labor import prohibitions or to enact and effectively enforce a prohibition." 91 Fed. Reg. 47,321. That is the stated purpose of all the tariffs in this action, so it cannot also explain the differential treatment here.

**B.      The Section 301 Tariffs Do Not Distinguish Between Types of Goods.**

107.    The USTR's tariffs apply uniformly to both intermediate goods and finished goods. Numerous witnesses identified this uniform treatment as irrational and counterproductive. Ignoring those comments without explanation underscores the arbitrary and capricious nature of the tariffs.

108.    Testimony noted that finished goods, and specific high-risk sectors, are the "crux of the forced labor risks." "[F]oreign producers of finished goods . . . benefit from lower forced labor standards and state-backed overcapacity and pricing distortions" in a way that is less true of the raw materials that are "essential to domestic production."

109.    In addition, the harms of tariffs are greater for raw materials. Importing raw materials is often "essential to domestic production," whereas importing finished goods can crowd out domestic production.

110.    Applying identical tariff measures to all goods, irrespective of supply chain position or risk profile, therefore fails to establish the required "rational connection between the

facts found and the choice made." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (citation modified).

### C. The USTR Failed to Adequately Respond to Comments and Testimony It Requested.

111. An agency must do more than acknowledge a category of comments; it must "respond[] to significant points raised by [the] public" bearing on its chosen course of action. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977) (citation modified).

112. The Tariff Action engaged with comments only in a facile manner. Broadly, the USTR rejected comments "that are inconsistent with the specific direction of the President." 91 Fed. Reg. 47,329. That is hardly a reasoned explanation.

113. Responding to comments arguing that tariffs will not achieve the desired results of decreasing forced labor, the USTR stated that it "has determined to impose tariffs as a means to encourage the investigated economies to impose and effectively enforce a forced labor ban." *Id.* But the USTR failed to explain how the tariffs will achieve those outcomes, offering instead a simple statement of disagreement, not a reasoned explanation.

114. Similarly, in the Report and Proposal, the USTR made no effort whatsoever to address any of the first round of comments or testimony that discuss tariffs as an improper method for addressing forced labor concerns, and instead only responded to comments about what forced labor conduct it considered "unreasonable."

115. Nowhere in the Report, Proposal, or Tariff Action does the USTR substantively engage with the overwhelming comments and testimony contradicting its conclusion that the tariffs the USTR is imposing are appropriate to address the harms that it identified.

**D.    The USTR Failed to Balance Costs and Benefits of the Section 301 Tariffs.**

116.    The USTR is required to balance the benefits it expects tariffs to produce with the harms they are likely to impose. *See Michigan v. EPA*, 576 U.S. 743, 752 (2015). But the benefits are illusory, and the harms are real. The USTR fails to show its reasoning in concluding otherwise.

117.    Comments and testimony received by the USTR underscore that there is no meaningful connection between the harms caused by forced labor and tariffs as a solution.

118.    In adopting the Section 301 tariffs, the USTR makes no effort to link tariffs to balancing or ending the harms caused by forced labor.

119.    Instead, at the hearings, witnesses across sectors—including manufacturing, import dependent industries, foreign governments, and labor rights organizations—presented extensive, unrebutted evidence that tariffs would not effectively address forced labor concerns and would inflict significant harm on U.S. commercial interests.

120.    Crucially, what emerged from the hearings is that trade with the United States, not its absence, discourages use of forced labor. Tariffs reduce that trade by raising prices of imported goods and so reduce the United States' positive influence.

121.    Tariffs are a poor way to assist those economies that are trying but failing to eliminate forced labor in their supply chains. As witnesses explained, tariffs on those economies will divert resources away from capacity building, discourage cooperation, and disrupt reform processes. That is why witnesses called for international cooperation and support for global institutions, not punishment and coercion.

122.    Imposing tariffs across the board is likely to weaken compliance efforts in precisely the jurisdictions the U.S. is attempting to encourage, as comments and testimony pointed out. In addition to failing to consider the actions taken to address the conduct and level

28

of economic development of each country, as stated above, failure to account for these foreseeable, adverse impacts on international enforcement cooperation would violate the APA's requirement of reasoned decision making.

123.    The Tariff Action does not engage meaningfully with these comments or the testimony, instead stating that countries' engagement with the USTR about forced labor after the Proposal was published is evidence that the tariffs will work. 91 Fed. Reg. 47,319–20. In fact, such consultation with an affected country is required as part of an investigation, *see* 19 U.S.C. § 2413, and the USTR failed to engage in those required consultations, instead using the Proposal as leverage after the fact.

124.    Tariffs are an unworkable solution for encouraging countries to adopt bans on imports made with forced labor in the first place. Several commenters explained that increasing tariff rates would not meaningfully incentivize countries to adopt or operationalize forced-labor import ban mechanisms and may in fact undermine that objective. That is because coercive tariff measures do not lead to durable institutional reforms. The adoption of import ban regimes requires legislative action, regulatory development, inter-agency coordination, and worker-centered enforcement capacity—none of which can be accelerated by punitive trade restrictions.

125.    The USTR does not meaningfully address these comments, nor does it identify any way in which the tariffs could change a country's behavior beyond the threat that tariffs impose: it provides no explanation or mechanism by which countries could negotiate their way out of the Section 301 tariffs, even by bolstering enforcement of forced labor bans. (At best, the Tariff Action may be read to suggest that negotiations might allow countries to bring their tariff level down from 12.5% to 10%, though it does not explicitly say that, either.)

126. Because the record shows that higher tariff rates are unlikely to produce the policy outcomes the agency purports to seek—and may instead impede them—relying on tariffs as a mechanism to compel foreign regulatory adoption lacks a reasoned basis and further underscores the arbitrary and capricious nature of such action.

127. By contrast, the harms caused by the tariffs are well-established. As a representative of the Forced Labor Working Group explained, "tariffs are a tax on U.S. importers, not foreign producers, which means that if tariffs are imposed under this investigation, they would tax the very companies that are doing the right thing, those building and implementing mechanisms and processes to stop forced labor from entering the supply chains."

128. Tariffs on goods without domestic substitutes are particularly harmful to the U.S. economy. So are tariffs on intermediate goods. Yet the USTR's tariffs include both. Compounding that harm, these punitive tariff rates are likely to lead to retaliatory tariffs from some affected trading partners, further punishing domestic producers and consumers.

129. A number of witnesses testified that U.S. domestic substitutes simply do not exist for many of the imported goods subject to the Section 301 tariffs, that broad tariffs on such goods cut off essential inputs used by U.S. manufacturers, that restricting inputs used in intermediate goods threatens production continuity across downstream industries, and that tariffs on intermediate goods essentially act as a tax on U.S. manufacturing: all harms to U.S. interests and companies that the USTR did not consider in implementing these tariffs.

130. Where, as here, the record shows that U.S. businesses require essential inputs that lack domestic substitutes, imposing tariffs that predictably raise costs on those U.S. businesses, disrupt supply chains, and impair U.S. productive capacity is arbitrary and capricious.

131. The USTR's action is not limited to goods produced in whole or in part with forced labor but instead applies to virtually all goods. As one U.S. manufacturer testified, "if you apply a flat tariff to all products from a particular country, every company may be absolutely disadvantaged, but the comparative benefits secured by those who exploit forced labor still remain. Indeed, exploiting forced labor may become even more lucrative if the legitimate business who spends more to keep their supply chains clean are struggling" because of tariffs. Numerous U.S. companies that import goods that cannot be domestically sourced testified about their work to ensure that their supply chains do not use forced labor. The tariffs will harm these U.S. companies and punish their efforts to prevent forced labor and raise working standards in the economies from which they source their supplies.

## PLAINTIFF STATES' INTERESTS

132. Plaintiff States provide a wide range of public services to their residents and visitors. Essential to the provision of those services is the purchase of equipment, supplies, parts, and other goods, many of which are imported from other countries. Plaintiff States directly import goods that are subject of the tariffs at issue, as well as purchase imported goods subject to these tariffs from vendors that pass along the cost of tariffs to Plaintiff States.

133. Plaintiff States also purchase other products that are manufactured or assembled in the United States but contain components subject to these tariffs that are imported from other countries. The prices of such goods are higher due to tariffs.

134. Because tariffs directly impact the costs of these products, they cause direct financial harm to Plaintiff States.

31

135.    In addition, the imposition of tariffs increases Plaintiff States' administrative costs by making it more difficult to budget for the purchase of goods and to audit vendor price adjustments.

## CAUSES OF ACTION

**Count I**
**Violation of the Administrative Procedure Act**
**Agency Action in Excess of Statutory Authority and Contrary to Law**
**(Against Defendants Greer, The Office of the United States Trade Representative, Scott, and U.S. Customs and Border Protection)**

136.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

137.    The APA requires that a court set aside final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

138.    The APA also requires that a court set aside final agency action that is "not in accordance with the law." 5 U.S.C. § 706(2)(A).

139.    Title III of the Trade Act of 1974, colloquially referred to as "Section 301," provides the circumstances and process by which the USTR can conduct an investigation that may culminate in the imposition of tariffs. 19 U.S.C. §§ 2411–2420.

140.    In addition to spelling out the process by which Section 301 can be invoked to support tariffs on imports, Section 301 allows the USTR to take "all *appropriate and feasible action authorized* . . . subject to the specific direction, if any, of the President . . . to obtain the elimination of [the unfair] act, policy, or practice." 19 U.S.C. § 2411(b)(2) (emphasis added).

141.    By failing to engage in consultations with the foreign countries concerned regarding the issues involved in its investigation, as required under Section 303 of the Trade Act of 1974, the Tariff Action is outside the USTR's statutory authority or, in the alternative, is "without observance of procedure required by law." *See* 5 U.S.C. § 706(2)(D).

32

142.    Further, by imposing tariffs that are not tied to ending or reversing the investigated conduct, failing to tailor the tariffs to achieve Section 301's statutory goal of eliminating the investigated conduct, and instead simply applying across-the-board tariffs, the Tariff Action is outside the USTR's statutory authority. *See HMTX Indus.*, 156 F.4th at 1252.

143.    By imposing tariffs against foreign countries en masse and not targeting or otherwise taking action on a selective basis, the Tariff Action is outside the USTR's statutory authority.

144.    By conducting a pretextual, sham investigation into 60 economies at once, publishing a single Report, and doing so in less than three months, the Tariff Action is outside the USTR's statutory authority. The USTR offers no finding explaining why tariffs at the rates of 10% or 12.5% are "appropriate" to eliminate the claimed forced-labor-import practices at all, much less why either of these rates is the level "appropriate" under Section 301 for each of the different 60 economies at issue.

### Count II
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action
### (Against Defendants Greer, The Office of the United States Trade Representative, Scott, and U.S. Customs and Border Protection)

145.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

146.    The USTR has not adequately explained how blanket global tariffs would help eliminate forced-labor imports in any country. Nor could it: the tariffs simply are not tied in any reasonable way to USTR's stated goals.

147.    Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52 (agency action must be supported by a "rational connection between the facts found and the choice made" (citation modified)); *Ohio v. EPA,* 603 U.S. 279, 292 (2024) ("An agency action qualifies as arbitrary or capricious if it is not reasonable and reasonably explained." (citation modified)).

148.    In applying the Section 301 tariffs nearly uniformly across 60 different economies, the USTR must adequately explain its rationale doing so. It has not.

149.    "If the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). By the same token, such a "relevant distinction" between cases, or in this case, countries, calls for either dissimilar treatment or an explanation. Indeed, the Tariff Action's irrational uniformity "fail[s] to consider an important aspect of the problem," namely the relevant differences. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

150.    Partly as a result of this irrational treatment, the tariffs are not reasonably calculated to reduce use of forced labor. They are, in short, not reasonable.

151.    Failing to meaningfully engage with or respond to the comments and testimony sought through the Section 301 process illustrates why the Tariff Action is arbitrary and capricious. *See Ohio v. EPA,* 603 U.S. at 292 (2024), *Home Box Office*, 567 F.2d at 35–36; *see also Texas Corn Producers v. U.S. EPA*, 141 F.4th 687, 701 (5th Cir. 2025) ("An agency fails to consider the relevant factors when it does not address comments raising points which, if true and which, if adopted, would require a change in the agency's proposed rule." (citation modified)).

152.    Finally, by engaging in a process that was so clearly intended to arrive at a predetermined outcome, the USTR has engaged in capricious decision-making. *See Dep't of*

*Com. v. New York*, 588 U.S. 752, 785 (2019) (holding that agency's explanation for its action was pretextual where it was "incongruent with what the record reveal[ed] about the agency's priorities and decisionmaking process.").

**Count III**
**The USTR Tariff Action is *Ultra Vires***
**(Against All Defendants)**

153.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

154.    The President has no inherent authority to impose tariffs. The Constitution grants only Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises" U.S. Const. art. I, § 8, cl. 1.

155.    USTR's authority under Section 301 is limited to specific circumstances and subject to rigorous procedural requirements.

156.    The Tariff Action makes clear that the USTR has neither satisfactorily explained that Section 301 should apply in these circumstances, nor complied with the procedural requirements set out in the statute.

157.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

158.    The Tariff Action does not comply with Section 301 or any other statute. The Tariff Action goes beyond the bounds of the authority to tariff in Section 301 and violates that statute. As such, they are ultra vires and unlawful.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that the Court:

      a.      Hold unlawful, vacate, and set aside the Tariff Action;

      b.      Stay the Tariff Action and delay its effective date pending judicial review;

      c.      Declare that the Tariff Action and actions to effectuate it are unlawful;

      d.      Preliminarily and permanently enjoin Defendants; their officers, agents, servants, employees, and attorneys; and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, enforcing, or giving effect to the Tariff Action in any form;

      e.      Award refunds to Plaintiff States for tariffs paid subject to the Tariff Action;

      f.      Award Plaintiff States' costs of suit and reasonable attorneys' fees and expenses under any applicable law; and

      g.      Award such additional relief as the interests of justice may require.

36

Respectfully submitted,

**DAN RAYFIELD**
Attorney General for the State of Oregon

BENJAMIN GUTMAN
Deputy Attorney General
DUSTIN BUEHLER
Special Counsel

By: */s/ Brian Simmonds Marshall*
Brian Simmonds Marshall
Leanne Hartmann
Samuel Kubernick*
Brian Collins*
*Senior Assistant Attorneys General*
YoungWoo Joh
Brian Bowcut
*Assistant Attorneys General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Brian.S.Marshall@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Samuel.A.Kubernick@doj.oregon.gov
Brian.Collins@doj.oregon.gov
YoungWoo.Joh@doj.oregon.gov
Brian.Bowcut@doj.oregon.gov

*Counsel for the State of Oregon*

**ROB BONTA**
Attorney General
State of California

By: */s/ Shiwon Choe*
Lara Haddad*
*Supervising Deputy Attorney General*
Shiwon Choe
Zelda Vassar
Carolyn Downs*
Samuel Sokolsky*
*Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Tel: (415) 510-4400
Lara.Haddad@doj.ca.gov
Shiwon.Choe@doj.ca.gov
Zelda.Vassar@doj.ca.gov
Carolyn.Downs@doj.ca.gov
Samuel.Sokolsky@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
Attorney General
State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor
*Solicitor General*
Syreeta A. Tyrell
Senior Litigation Counsel
Timothy E.D. Horley*
Jaylia Yan *
*Assistant Attorneys General*
2005 North Central Avenue
Phoenix, Arizona 85004
Tel: (602) 542-3333
Joshua.bendor@azag.gov
Syreeta.Tyrell@azag.gov
Timothy.Horley@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

37

**PHILIP J. WEISER**
Attorney General State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway #10
Denver, CO 80203
Tel: (720) 508-6000
Sarah.Weiss@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Michael Skold*
Michael Skold
*Solicitor General*
165 Capitol Ave
Hartford, CT 06106
Tel: (860) 808-5020
Michael.Skold@ct.gov

*Counsel for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Ian R. Liston*
IAN R. LISTON
*Director of Impact Litigation*
VANESSA L. KASSAB
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
Tel: (302) 683-8899
ian.liston@delaware.gov

*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
Tel: (808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**KWAME RAOUL**
Attorney General State of Illinois

By: */s/ Gretchen Helfrich*
Cara Hendrickson
*Executive Deputy Attorney General*
Gretchen Helfrich
*Deputy Chief, Special Litigation Bureau*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel: (312) 814-3000
Cara.Hendrickson@ilag.gov
Gretchen.helfrich@ilag.gov

*Counsel for the State of Illinois*

**OFFICE OF THE GOVERNOR *ex rel.*
ANDY BESHEAR**
In his official capacity as Governor of the
Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo*
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor
501 High Street Frankfort, KY 40601
Tel: (502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Counsel for Governor Andy Beshear*

**AARON M. FREY**
Maine Attorney General

By: */s/ Katherine W. Thompson*
Katherine W. Thompson
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: (207) 626-8455
Fax: (207) 287-3145
Kate.thompson@maine.gov

*Counsel for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ James C. Luh*
James C. Luh*
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel: (410) 576-6411
jluh@oag.maryland.gov

*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF
MASSACHUSETTS

By: */s/ Katherine Dirks*
Katherine Dirks
*Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
Tel: (617) 963-2277
katherine.dirks@mass.gov

*Counsel for the Commonwealth of
Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
Tel: (517) 241-1050
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General State of Minnesota

By: */s/ Lindsey E. Middlecamp*
PETER J. FARRELL (0393071)
*Deputy Solicitor General*
LINDSEY E. MIDDLECAMP (0392589)
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
Peter.farrell@ag.state.mn.us
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

40

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ David N. Birch*
David N. Birch*
*Deputy Attorney General*
124 Halsey Street, 5th Floor
Newark, New Jersey 07101
Tel: (609) 696-5363
david.birch@law.njoag.gov


*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Amy Senier*
AMY SENIER
*Senior Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
Tel: (505) 490-4060
asenier@nmdoj.gov


*Counsel for the State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
28 Liberty St.
New York, NY 10005
Tel: (212) 416-8883
rabia.muqaddam@ag.ny.gov


*Counsel for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By: */s/ Daniel T. Wilkes*
Daniel T. Wilkes
*Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
Tel: (919) 716-6415
dwilkes@ncdoj.gov


*Counsel for the  State of North Carolina*

**JOSH SHAPIRO**,
in his official capacity as Governor of the
Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

By: */s/ Jacob B. Boyer*
Jennifer C. Selber
Jacob B. Boyer
*Deputy General Counsel*
Governor's Office of General Counsel
30 North 3rd Street, Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Alex Carnevale*
Alex Carnevale*
*Special Assistant Attorney General*
Office of the Attorney General - State of
Rhode Island
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
acarnevale@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Ryan P. Kane*
RYAN P. KANE
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Counsel for the State of Vermont*

**JAY JONES**
Attorney General for the Commonwealth of
Virginia

By: */s/Megan C. Keenan*
Megan C. Keenan*
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
Tel: (804) 997-5222
mkeenan@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

By: */s/ S. Todd Sipe*
TODD SIPE, WSBA 23203
*Assistant Attorney General*
Office of the Washington State Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel: (206) 464-7744
todd.sipe@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**
Attorney General of the State of Wisconsin

By: */s/ Brian Keenan*
Brian Keenan
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707
Tel: (608) 266-0020
brian.keenan@wisdoj.gov

*Counsel for the State of Wisconsin*

\* *Admission application pending or forthcoming*

Dated: August 3, 2026